USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8/21/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

ERIC ROMAN,                                            :
                                                       :
        Plaintiff,                                   :
                                                       :
   -against-                                         :    19-CV-3688 (JLC)
                                                       :
ANDREW M. SAUL,                                        :
Commissioner, Social Security Administration,          :
                                                       :
       Defendant.                                   :
                                                       :
------------------------------------------------------------------X

## OPINION & ORDER

**TABLE OF CONTENTS**

I.   BACKGROUND ........................................................................................... 1

  A.  Procedural Background ........................................................................... 1

  B.  The Administrative Record ..................................................................... 2

    1.  Roman's Background ........................................................................... 2

    2.  Relevant Medical Evidence ................................................................ 4

      a.  Treatment History (Physical Impairments) ................................... 4

        i.  Marguerite G. Bernard, M.D.—Treating Physician ................... 4

        ii.  Bronx Lebanon Hospital ........................................................... 5

        iii.  Fenar Themistocle, M.D.—Treating Pain Management Physician ....... 8

        iv.  Carlos Arias, M.D.—Rehabilitation Specialist ...................... 10

        v.  Sleep Disorders Institute ......................................................... 11

        vi.  Lucia D. Voiculescu, M.D.—Pain Management Specialist .................. 11

      b.  Treatment History (Mental Impairments) ................................... 12

        i.  Morris Heights Health Center, Behavioral Health Facility ................ 12

        ii.  Center for Comprehensive Health Practice ............................ 15

      c.  Opinion Evidence ........................................................................ 16

        i.  Cheryl Archbald, M.D.—Consultative Examiner ..................... 16

        ii.  Fenar Themistocle, M.D.—Treating Physician ...................... 18

        iii.  Sharon Chu, M.D.—Consultative Examiner ........................... 19

        iv.  Arlene Rupp-Goolnick, Ph.D.—Consultative Examiner .................... 20

        v.  T. Inman-Dundon, Ph.D.—State Agency Medical Consultant ........... 20

        vi.  Joao Nunes, M.D.—Treating Psychiatrist ............................. 22

        vii.  Hun Han, M.D.—FEDCAP Evaluator .................................... 23

        viii.  Darryl C. Smith, M.D.—Treating Psychiatrist ..................... 24

    3.  ALJ Hearing ....................................................................................... 26

II.  DISCUSSION ........................................................................................... 28

  A.  Legal Standards ...................................................................................... 28

    1.  Judicial Review of Commissioner's Determinations ....................... 28

2.    Commissioner's Determination of Disability ................................. 30

    a.    Five-Step Inquiry ...................................................... 31

    b.    Duty to Develop the Record ..................................... 32

    c.    Treating Physician's Rule ......................................... 33

    d.    Claimant's Credibility .............................................. 37

B.    The ALJ's Decision .......................................................................... 38

C.    Analysis ............................................................................................ 42

    1.    The ALJ Violated the Treating Physician Rule as to Dr. Themistocle ....... 43

    2.    The ALJ Violated the Treating Physician Rule as to Drs. Nunes
        and Smith ............................................................................... 49

    3.    Roman's Credibility Should Be Revisited on Remand ................................ 56

    4.    The ALJ Did Not Err in Evaluating Roman's Obesity ............................... 58

III.  CONCLUSION ........................................................................................ 60

**JAMES L. COTT, United States Magistrate Judge.**

Plaintiff Eric Roman seeks judicial review of a final determination by defendant Andrew M. Saul, the Commissioner of the Social Security Administration, denying Roman's application for supplemental security income under the Social Security Act.  The parties have cross-moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  For the reasons set forth below, Roman's motion is granted, the Commissioner's cross-motion is denied, and the case is remanded for further proceedings.

## I.      BACKGROUND

### A.  Procedural Background

Roman filed for Supplemental Security Income ("SSI") on October 7, 2015 alleging a disability onset date of August 1, 2014.[1]  Administrative Record ("AR"), Dkt. No. 9 at 302–11, 320, 323.[2]  The Social Security Administration ("SSA") denied his application on January 4, 2016.  *Id.* at 215–19.  On January 20, 2016, Roman filed a request for a hearing before an Administrative Law Judge ("ALJ").  *Id.* at 220–22.  Roman appeared with his counsel at a video hearing before ALJ Dina R. Loewy on May 3, 2018.  *Id.* at 121–55, 220–22.  Thereafter, the ALJ found that

---

[1] In her decision, the ALJ stated that the application was filed on October 7, 2015; however, the record reflects that it was submitted on November 30, 2015.  *See* AR at 302, 323.  Given that the parties have not suggested otherwise in their submissions, the Court adopts October 7, 2015 as the operative filing date.

[2] The page numbers refer to the sequential numbering of the Administrative Record provided on the bottom right corner of the page, not the numbers produced by the Electronic Case Filing System.

Roman was not disabled and denied his claims in a written decision dated July 30, 2018. *Id*. at 16–35. Roman sought review of the ALJ's decision by the SSA Appeals Council on August 22, 2018. *Id*. at 300–01. The Appeals Council affirmed the decision on February 22, 2019, rendering the ALJ's decision final. *Id*. at 1–7.

Roman timely commenced the present action on April 25, 2019, seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). *See* Complaint, Dkt. No. 1. The Commissioner answered Roman's complaint by filing the administrative record on August 26, 2019. AR, Dkt. No. 9. On October 15, 2019, Roman moved for judgment on the pleadings seeking remand for further administrative proceedings and submitted a memorandum of law in support of his motion. Motion for Judgment on the Pleadings, Dkt. No. 10; Memorandum of Law in Support of Motion ("Pl. Mem."), Dkt. No. 11. The Commissioner cross-moved for judgment on the pleadings on December 16, 2019 and submitted a memorandum in support of his cross-motion. Cross-Motion for Judgment on the Pleadings, Dkt. No. 12; Memorandum of Law in Support of Cross-Motion ("Def. Mem."), Dkt. No. 13. On January 6, 2020, Roman filed reply papers. Reply Memorandum of Law in Further Support of Motion ("Pl. Reply"), Dkt. No. 14.

## B. The Administrative Record

### 1. Roman's Background

Roman was born on September 6, 1973. AR at 302. He was thus 44 at the time of his hearing date (May 3, 2018). *Id*. at 125. In high school, Roman was enrolled in special education as a result of emotional problems he had, but dropped

out before graduating. *Id.* at 706, 887, 912. He subsequently obtained his GED when he was 17. *Id.* at 126, 706. Starting at 18, Roman worked in a variety of jobs in security, with his last job as a security guard ending in 2005. *Id.* at 326, 887. He was required to "stand, climb stairs, and walk a lot" in these jobs. *Id.* at 701, 706. Roman ultimately stopped working in 2005 for medical reasons and because of alcohol abuse issues. *Id.* at 127, 706, 887.

At the time of the hearing Roman lived with his wife and two children, aged 21 and 13, in public housing in Manhattan. *Id.* at 126, 130. Prior to moving into public housing in 2016, Roman had been living in a shelter. *Id.* at 130, 928. Roman reported that he used to "socialize with people in public, lift weights, [and] groom independently," but his health has deteriorated such that he is now "in constant pain" and needs help to change his clothes, shave, bathe, and get up from the floor and sofa. *Id.* at 333–35. Roman testified that he spends most of his day laying down and watching TV due to "extreme pain" and either his wife or his children prepare his meals because he is unable to stand for extended periods of time. *Id.* at 127–28. Roman also reported that his wife completes the household chores. *Id.* at 334, 708. He sometimes goes outside for appointments or to visit family or friends, and travels by car or public transportation. *Id.* at 335–36. He requires knee braces on both knees at all times and reported being able to walk one city block before needing a 10-minute rest. *Id.* at 338. Roman testified that he sometimes has trouble remembering things and becomes unfocused under stress or when his schedule changes. *Id.* at 339.

### 2.  Relevant Medical Evidence

#### a.  Treatment History (Physical Impairments)

##### i.     Marguerite G. Bernard, M.D.—Treating Physician

Roman received treatment at Morris Heights Health Center ("MHHC") from April 21, 2010 to June 15, 2017.  *Id.* at 441–595, 848–976.  Roman's primary care physician at MHHC, Marguerite G. Bernard, M.D., treated him intermittently during this time, approximately one to four times per year.  *See id.* at 504–15, 516–48, 551–54, 770–74, 945–55, 960–62.  For purposes of this opinion, the Court will focus only on the period at issue, from the onset date (August 1, 2014) to the date of the ALJ's disability determination (July 30, 2018).[3]

During an office visit with Dr. Bernard on October 13, 2015, Roman reported pain in his lower back, right knee, and left shoulder.  *Id.* at 770–74.  Dr. Bernard observed that Roman had a full range of motion and a normal gait but wore knee braces.  *Id.* at 772.  She prescribed pain medication (anaprox and gabapentin) and referred Roman to an orthopedist for his lower back pain, right knee pain, and left shoulder pain.  *Id.* at 773.

Roman met with Dr. Bernard again on February 27 and March 10, 2017.  *Id.* at 945–48, 950–55.  She noted that Roman appeared in no acute distress with a normal gait.  *Id.* at 945, 951.  She diagnosed Roman with diabetes, hypertension,

---

[3] *See, e.g., Carway v. Colvin,* No. 13-CV-2431 (SAS), 2014 WL 1998238, at *5 (S.D.N.Y. May 14, 2014) ("[M]edical evidence that predates the alleged disability onset date is ordinarily not relevant to evaluating a claimant's disability.").

morbid obesity, and a body mass index ("BMI") of 40.0–44.9. *Id.* at 945–46, 951.[4]

Dr. Bernard referred Roman to Montefiore Moses Division for a consultation on

bariatric procedures for weight loss and to a nutritionist for a dietary evaluation.

*Id.* at 954. Dr. Bernard treated Roman for an abscess during an April 19, 2017

office visit and her notes from that visit were consistent with her records from prior

appointments. *Id.* at 960–62.

### ii.   Bronx Lebanon Hospital

On September 4, 2015, Roman presented to the Bronx-Lebanon Hospital

emergency department and was diagnosed with acute pain in his left shoulder. *Id.*

at 637. The discharge report shows that Roman was prescribed several medications

at that time, including fluticasone, albuterol, gabapentin, quetiapine, citalopram,

acetaminophen-oxycodone, atorvastatin, aspirin, montelukast, omeprazole,

amlodipine. *Id.*[5] The report also reported his BMI as 36.3. *Id.* at 638.

---

[4] "Body mass index (BMI) is a measure of body fat based on height and weight that applies to adult men and women." *See* CALCULATE YOUR BODY MASS INDEX, NATIONAL HEART, LUNG, AND BLOOD INSTITUTE, https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm (last visited Aug. 20, 2020).

[5] Fluticasone can be used to relieve symptoms of rhinitis such as sneezing and runny or stuffy nose. *See generally Fluticasone Nasal Spray*, U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/druginfo/meds/a695002.html, (last visited Aug. 20, 2020).

Albuterol can be used to prevent and treat symptoms of asthma. *See generally Albuterol*, U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/druginfo/meds/a607004.html, (last visited Aug. 20, 2020).

Quetiapine can be used to treat symptoms of schizophrenia, mania, or depression in patients with bipolar disorder. *See generally Quetiapine*, U.S. NATIONAL LIBRARY OF

Two months later, on November 4, 2015, Roman was again admitted to the emergency room and diagnosed with shoulder pain.  *Id*. at 634–35.  X-rays of Roman's left shoulder revealed mild degenerative osteoarthritis at the acromioclavicular ("AC") joint.  *Id*. at 634–35.[6]  Roman reported to the emergency room again on November 9, 2015, *id*. at 636, and on November 13, 2015, complaining of shoulder and neck pain, *id*. at 675–77.

On November 16, 2015, Roman met with Moneef Hauter, M.D., an orthopedic specialist, at Bronx-Lebanon Hospital.  *Id*. at 669–71.  Roman appeared obese, with

---

MEDICINE: MEDLINE PLUS, https://medlineplus.gov/druginfo/meds/a698019.html, (last visited Aug. 20, 2020).

Citalopram can be used to treat symptoms of depression.  *See generally Citalopram*, U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/druginfo/meds/a699001.html, (last visited Aug. 20, 2020).

Atorvastatin can be used to reduce the risk of heart attack and stroke.  *See generally Atorvastatin*, U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/druginfo/meds/a600045.html, (last visited Aug. 20, 2020).

Montelukast can be used to prevent symptoms of asthma.  *See generally Montelukast*, U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/druginfo/meds/a600014.html, (last visited Aug. 20, 2020). Omeprazole can be used to treat the symptoms of gastroesophageal reflux disease. *See generally Omeprazole*, U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/druginfo/meds/a693050.html, (last visited Aug. 20, 2020).

Amlodipine can be used to treat high blood pressure.  *See generally Amlodipine*, U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/druginfo/meds/a692044.html, (last visited Aug. 20, 2020).

[6] The AC joint is located in the shoulder where the two bones in the clavicle and the shoulder blade meet.  *See* AC JOINT PROBLEMS, JOHNS HOPKINS MEDICINE, https://www.hopkinsmedicine.org/health/conditions-and-diseases/ac-joint-problems (last visited Aug. 20, 2020).  Osteoarthritis of the joint results from the loss of cartilage in the joint which prevents the bones from moving smoothly.  *Id*.

a normal gait, and had a positive Spurling test.[7]  *Id.* at 670.  He had diffuse

shoulder pain that worsened with overhead motions and caused tingling sensations,

but he reported that his pain improved with medication and rest.  *Id.* at 669–70.

Based on Dr. Hauter's physical examination of Roman's spine, Roman was found to

have range of motion with pain.  *Id.* 670.  Dr. Hauter diagnosed Roman with

bilateral rotator cuff tendinitis and neck pain and prescribed pain medications

(cyclobenzaprine and ultram).  *Id.* at 640, 670–71.  Dr. Hauter also ordered a

magnetic resonance imaging ("MRI") of Roman's neck and referred Roman for

physical therapy.  *Id.* at 671.  Roman returned to the emergency room on November

25, 2015 for a refill of his medication and was again diagnosed with tendinitis of

both shoulders.  *Id.* at 657.

On December 1, 2015, Roman underwent an MRI of his cervical spine.  *Id.* at

630.  The findings revealed multilevel disc herniations and uncovertebral

hypertrophy, but no evidence of cord compression.  *Id.* at 631–32.[8]  At a follow-up

---

[7] The Spurling test is used to diagnose cervical radiculopathy, a condition that occurs when a nerve in the neck is pinched near the area where it branches away from the spinal cord.  *See* Jill Seladi-Schulman, WHAT IS THE SPURLING TEST?, HEALTHLINE, https://www.healthline.com/health/spurling-test (last visited Aug. 20, 2020).  The test is typically performed with the physician bending the patient's head toward one side of the body and applying pressure to the top of the head.  *Id.*  A positive result indicates that pain is radiating into the patient's arm.  *Id.*

[8] The uncovertebral joints are located on each side of the four cervical discs between levels C3 and C7 in the spine, functioning to control the movements of the cervical spine and stabilize the neck.  *See* Jana Vaskovic, UNCOVERTEBRAL JOINTS, KENHUB, https://www.kenhub.com/en/library/anatomy/uncovertebral-joints (last visited Aug. 20, 2020).  Hypertrophy, or hypertrophic arthritis, is a type of osteoarthritis that causes deformation of the articular cartilage in the joints.  *Id.*

visit with Dr. Hauter on December 7, 2015, Roman reported continued pain with a pain score of 4 and sleep disturbances. *Id.* at 660. Dr. Hauter reviewed Roman's MRI and referred him for physical therapy. *Id.* at 660–62.

On December 14, 2015, Dr. Nehaben Swaminrayan, a physical therapist at Bronx-Lebanon Hospital, conducted an initial physical therapy evaluation on Roman. *Id.* at 1054–61. She observed that Roman was limping and had "neck pain and [] tenderness." *Id.* at 1054–55. A functional analysis revealed "difficulty in doing shoulder level/overhead movements" and "household chores/activities of daily living that requires reaching, pulling, pushing, gripping, grasping, and lifting up to/more than 5 [pounds]." *Id.* at 1055. Swaminrayan diagnosed Roman with neck pain radiating towards his left upper extremity and recommended six weeks of physical therapy. *Id.* at 1057–58.

### iii.   Fenar Themistocle, M.D.—Treating Pain Management Physician

Fenar Themistocle, M.D., a pain management physician at the Interborough Interventional Pain Management clinic, treated Roman from July 2013 to 2016. *Id.* at 1067–1101. Dr. Themistocle first saw Roman in 2013 for neck and lower back pain, at which time Dr. Themistocle recommended continued physical therapy and a follow-up consultation. *Id.* at 1067. Roman returned for a follow-up consultation more than two years later, on December 8, 2015, complaining of pain that had been "increasing in intensity for the past couple of months." *Id.* Roman rated the pain a 5 out of 10 with medication and a 9 out of 10 without medication. *Id.* Dr. Themistocle assessed tenderness in Roman's lower back and observed pain and

limitations in Roman's lower back and neck during the physical examination. *Id*. at 1071. Dr. Themistocle diagnosed Roman with chronic pain syndrome, lumbosacral neuritis, and myalgia and myositis. *Id*. He instructed Roman to follow up with the pain management clinic, continue to take his medication, and attend physical therapy. *Id*. Dr. Themistocle requested an MRI of Roman's lumbar spine, which was conducted on December 9, 2015 and revealed several disc herniations, acute inflammation, and straightening of the spine that could be due to muscle spasm. *Id*. at 698. The MRI showed no evidence of spinal stenosis. *Id*. at 698.[9]

A few weeks later, on December 24, 2015, Roman had a follow-up visit with Marie Bien-Aime, a nurse practitioner in Dr. Themistocle's office, who reported multiple disc bulges based on his MRI and referred Roman for pain management procedures. *Id*. at 1073, 1075.

Roman received an epidural steroid injection from Dr. Themistocle's clinic on January 6, 2016, which reduced his pain from a 9 out of 10 to a 3 out of 10. *Id*. at 1077–79. On February 8, 2016, Roman reported that his pain started to increase, *id.* at 1081, and, on March 30, 2016, Roman received another epidural steroid injection after reporting pain radiating to his lower extremities that continued to affect his daily activities, *id.* at 1084, 1088. Roman returned for a follow-up visit on June 10, 2016, during which Bien-Aime reported Roman had a 75 percent

---

[9] Spinal stenosis occurs when the spaces in the spine narrow, usually over time, and create pressure on the spinal cord and nerve roots. *See* SPINAL STENOSIS, NATIONAL INSTITUTE OF ARTHRITIS AND MUSCULOSKELETAL AND SKIN DISEASES, https://www.niams.nih.gov/health-topics/spinal-stenosis (last visited Aug. 20, 2020).

improvement since his last injection, but that he had reoccurring pain. *Id.* at 1091. At his follow up appointments on September 23 and December 16, 2016, Roman reported similar levels of improvement and Dr. Themistocle's diagnoses and treatment recommendations remained consistent with previous treatment notes. *Id.* at 1094–1101.

### iv.    Carlos Arias, M.D.—Rehabilitation Specialist

On February 16, 2018, Roman had an appointment with Carlos Arias, M.D., a rehabilitation specialist, due to low back and neck pain. *Id.* at 1018. Roman reported that he had difficulty attending follow-up appointments with his primary care physician and pain management doctor because their offices were too far and he has limited mobility. *Id.* Dr. Arias noted Roman's mildly antalgic gait and intact balance. *Id.* at 1019. He also observed that Roman wears a back brace and bilateral knee braces but uses "no gait aid." *Id.* at 1018–19. Dr. Arias reported a negative straight leg test but found limitations in Roman's shoulder and hip due to pain. *Id.* at 1018.[10] Dr. Arias diagnosed Roman with chronic neck and low back pain, and cervical and lumbar spinal stenosis, and referred him to Bellevue Pain Clinic for pain medications and epidural injections. *Id.* at 1019, 1021.

---

[10] The straight leg test "is a very accurate predictor of a disk herniation in patients under the age of 35." *Herniated Disk in the Lower Back*, U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/druginfo/meds/a692044.html (last visited Aug. 20, 2020). "During the test, you lie on your back and your doctor carefully lifts your affected leg. Your knee stays straight. If you feel pain down your leg and below the knee, it is a strong indication that you have a herniated disk." *Id.*

### v.   Sleep Disorders Institute

On February 28, 2018, Maha Ahmad, M.D., conducted a polysomnography test on Roman at the Sleep Disorders Institute and diagnosed severe obstructive sleep apnea resulting in sleep fragmentation and hypoxemia. *Id* at 1022. Dr. Ahmad recommended weight loss (at the time Roman's BMI measured 42) and a follow-up overnight appointment. *Id.* At the follow-up appointment on March 31, 2018, Dr. Ahmad found that Roman's obstructive sleep apnea was effectively treated with a nasal CPAP and recommended nightly use. *Id.* at 1031.

### vi.   Lucia D. Voiculescu, M.D.—Pain Management Specialist

On April 23, 2018, pain management specialist Lucia Voiculescu, M.D., evaluated Roman at Bellevue Hospital's pain management clinic. *Id*. at 1109. Roman reported that he has a history of chronic neck and "tailbone" pain, and that the tailbone pain is the most problematic for him. *Id.* He explained that he started feeling intermittent pain after he fell in 2000, but recently the pain had become worse. *Id.* He denied any radiation of pain into his legs. *Id.* He reported that the two injections he received did not provide much relief. *Id.* Dr. Voiculescu discussed with Roman the importance of activity and weight loss and recommended Roman continue using gabapentin, robaxin, and ibuprofen for pain management. *Id*. at 1110.

### b. Treatment History (Mental Impairments)

### i. Morris Heights Health Center, Behavioral Health Facility

Roman also received mental health treatment at MHHC from April 2010 through June 2017. *Id.* at 485. With respect to the period at issue, from January 2014 to February 2015, Roman received treatment for his psychiatric impairments at MHHC almost every month and was mainly treated by Alfred Fiad, M.D., a psychiatrist, and Sharon Pluskalowski, a licensed clinical social worker. *See id.* at 485, 720–54. Roman reported his psychiatric impairments at his initial appointments, which included a history of suffering from bipolar disorder, mania, depression, Attention Deficit Disorder as a child, and behavioral problems including aggression, which has resulted in six psychiatric hospitalizations. *Id.* at 590, 602, 753. Roman also described a series of traumas, including a sexual assault by two males when he was a child and being shot three times while working as a security guard in 1991. *Id.* at 602.

At the time of his disability onset date (August 1, 2014), Roman was in an outpatient program at MHHC. *Id.* at 739. As part of that outpatient program, Roman saw Dr. Fiad for a psychiatric follow-up visit for depression on September 17, 2014. *Id.* at 739. Roman admitted that he had not been compliant with his psychiatric medications (at the time he was taking seroquel, gabapentin, and celexa). *Id.* He reported no acute depressive symptoms. *Id.* Dr. Fiad observed that Roman had limited memory; poor judgment, insight and impulse control; and average intellectual functioning. *Id.* at 739–40. Dr. Fiad diagnosed Roman with

bipolar disorder unspecified, prescribed refills of seroquel, gabapentin, and celexa, and recommended a follow-up visit in six weeks. *Id*. at 740.

At his next appointment with Dr. Fiad on November 26, 2014, Roman reported poor sleep, mood swings, and irritability. *Id*. at 746. Dr. Fiad found Roman had a depressed mood but normal affect and appropriate ideation. *Id*. He refilled Roman's prescriptions and scheduled him for a follow-up appointment in about two months. *Id*. at 747–48.

Roman had follow-up visits with Pluskalowski in October 2014 and January 2015. *Id*. at 742–45, 749–52. At these appointments, Roman reported that "living in a shelter" was preventing him from "learning about [his] diagnosis, analyzing behavior, staying sober, [and using] anger management techniques." *Id*. at 743, 750. On February 13, 2015, Roman was discharged from the outpatient program for failing to attend his appointments following the January 2015 session. *Id*. at 753–54.

On October 26, 2015, Roman returned to MHHC and received counseling from Marion S. Wise, a social worker, due to paranoia, anxiety, and worsening sleep difficulties. *Id*. at 612. Roman reported that he was "constantly grieving," "lost interest in a lot of things," and "barely sleeps" (less than 3 hours a night). *Id*. Wise observed moderate depression, mania, and personality functioning, and severe anger, anxiety, somatic symptoms, sleep problems, and substance use. *Id*. at 613. Wise found post-traumatic stress disorder and bipolar disorder. *Id*.

A few weeks later, on November 11, 2015, Roman returned to MHHC for counseling and met with another social worker, Shelbi Simmons. *Id.* at 884–89. Roman reported depressive, manic, behavioral, and anxiety issues, as well as trauma symptoms. *Id.* at 885. Simmons observed a normal mood, a flat but constricted affect, and appropriate ideation, and assessed Roman for posttraumatic stress disorder ("PTSD"). *Id.* at 888. Roman had two more counseling sessions with Simmons on December 22, 2015 and February 17, 2016. *Id.* at 893–95, 903–05. During both sessions Roman reported feeling trapped and hopeless. *Id.* at 894, 904. At the February 2016 session, Simmons administered PHQ-9 and GAD tests and reported that Roman scored within the moderately-severe range for depression and within the severe range for anxiety. *Id.* at 904.

On January 5, 2016, Roman returned to MHHC for an appointment with Joao Nunes, M.D. *Id.* at 783. Dr. Nunes assessed bipolar 1 disorder and scheduled a follow-up visit in four weeks. *Id.* at 786. At his next visit on February 13, 2016, Roman reported that he was feeling anxious, irritable, and unable to sleep well. *Id.* at 900. He also described experiencing racing thoughts and nightmares, and complained of back pain. *Id.* Roman believed his current medications were losing their effectiveness and Dr. Nunes increased his dose of seroquel and gabapentin. *Id.* In addition to bipolar disorder, Dr. Nunes diagnosed Roman with PTSD. *Id.* at 901.

Roman observed a marked improvement in his condition at the next appointments on March 12 and April 9, 2016. *Id.* at 906, 912. At the next visit, on

14

June 18, 2016, Dr. Nunes reported that Roman was dealing with severe loss after his brother-in-law passed away and his sister was in the hospital with serious health issues. *Id.* at 915. Dr. Nunes reported that Roman was appropriately sad and contrite, and had been holding up without new symptoms or relapses. *Id.* At his next appointment on August 18, 2016, Roman reported that his sister passed away and Dr. Nunes noted that he was "very affected by grief," but was stable and did not have a relapse. *Id.* at 924.

Roman had subsequent follow up visits on October 11, 2016 and January 17, 2017. *Id.* at 930, 942. At both visits, Roman reported no new symptoms, relapses, or side effects from his medication. *Id.*

### ii.   Center for Comprehensive Health Practice

After moving from a family shelter to stable housing in 2016, Roman changed his primary care clinic from the MHHC in the Bronx to the Center for Comprehensive Health Practice ("CCHP") in Manhattan. *Id.* at 130, 928, 977. Pamela Mahmud, M.D., conducted an initial evaluation of Roman on June 13, 2017 and diagnosed Roman with hypertension, asthma, bipolar disorder, and Type II diabetes. *Id.* at 977–78. Thereafter, Roman had monthly follow-up visits with Darryl Smith, M.D., at CCHP from July 2017 to March 2018 to treat his depression and anxiety. *Id.* at 980–1004. At times Roman was "depressed," *id.* at 982, 985, 989, and at other times he felt "better," *id.* at 994, 999.

At an initial evaluation on July 18, 2017, Dr. Smith observed that Roman was obese, depressed, and showed moderate symptoms of aggression and anger

control. *Id*. at 982–83. He diagnosed unspecified affective disorder and noted that Roman was stable on his current medication, remeron, gabapentin, seroquel, and celexa. *Id*. at 983.

Roman had another office visit on August 23, 2017, during which he reported suicidal ideation, a recent episode of self-harm, and depression that was causing difficulty sleeping and decreased concentration and energy. *Id*. at 985. Roman discussed his extreme weight gain in the context of chronic depression and noted that his physical problems limited his capacity to engage in work-related activities. *Id*. He also described that he felt better when he took his medication consistently. *Id*. Dr. Smith again recorded that Roman was stable on his current regimen. *Id*. at 986.

Roman reported feeling "okay" overall at his next appointment on February 27, 2018. *Id*. at 1001. Dr. Smith explained to Roman how his weight contributed to his co-morbid conditions and the procedures that could help him lose weight and return to work. *Id*. Roman responded that he planned to eventually lose weight and return to work. *Id*. Roman had a follow-up visit with Dr. Smith on March 28, at which Roman was found to be depressed, anxious, and stressed. *Id*. at 1003–04. Dr. Smith noted that Roman had relapsed on marijuana and beer. *Id*. at 1003.

### c. Opinion Evidence

#### i. Cheryl Archbald, M.D.—Consultative Examiner

Cheryl Archbald, M.D., performed an Internal Medicine Examination on December 23, 2015. *Id*. at 701–05. Roman told Dr. Archbald that he suffered from

osteoarthritis affecting his neck, left shoulder, lower back, and right knee (since 2011), anxiety and depression (since childhood), Wolff-Parkinson-White Syndrome, and posttraumatic stress disorder (since 1991). *Id*. at 701–02.[11]  He described chronic pain from his osteoarthritis that gets worse when kneeling, bending, and getting up after lying down. *Id*. at 701.  Roman also reported wearing bilateral knee braces since 2011 or 2012. *Id*. Roman stated he could make light meals, shower, bathe, and dress himself but is limited in other chores such as cleaning (because he cannot stand long due to pain), and laundry and shopping (because he can only carry up to 15 pounds). *Id*. at 703.

Dr. Archbald conducted a musculoskeletal examination, but Roman deferred several of the tests involved due to concerns of pain when he squats, walks on his heels or toes, and flexes or extends parts of his body. *Id*. at 704.  Roman had reduced range of motion in his spine and in both shoulders and had a positive straight leg test in the supine position only. *Id*.  Dr. Archbald assessed full grip strength in Roman's hands, and no sensory deficits in his upper and lower extremities. *Id*. at 705.  Dr. Archbald opined that Roman has a moderate limitation in his ability to lift and carry and marked limitations in his ability to kneel, climb

---

[11] Wolff-Parkinson-White syndrome ("WPW") can lead to periods of rapid heart rate. *See* WOLFF-PARKINSON-WHITE SYNDROME (WPW), U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/ency/article/000151.htm, (last visited Aug. 20, 2020).  The long-term treatment for WPW is often catheter ablation, which destroys the small area of the heart that causes the rapid heart rate. *Id.*  Dr. Archbald noted that Roman's WPW status was "post ablation."  AR at 705.

stairs, and bend over.  *Id.*  She also found that Roman should avoid environmental triggers for his asthma.  *Id.*

### ii.    Fenar Themistocle, M.D.—Treating Physician

Dr. Themistocle completed a medical source statement on December 16, 2016. *Id.* at 841–47.  He diagnosed Roman with chronic pain syndrome, myalgia, and lumbosacral neuritis.  *Id.* at 841.[12]  Roman showed signs of dizziness, tiredness, upper back pain and radiating bilateral knee pain, and identified signs of swelling, tenderness, muscle spasms and weakness.  *Id.* at 841.  Dr. Themistocle also reported that Roman's depression and anxiety affect his physical pain, and he "often" experiences pain severe enough to interfere with attention and concentration.  *Id.* at 842.  Additionally, Dr. Themistocle noted that Roman's medications cause dizziness and drowsiness, which may have implications on his ability to work.  *Id.*

Dr. Themistocle opined as follows: Roman can only sit, stand, or walk about for less than 15 minutes before needing to alternate his posture.  *Id.* at 842–43. Specifically, after sitting for the maximum continuous period (less than 15

---

[12] Myalgia describes muscle pain, involving ligaments, tendons, or the soft tissues that connect muscles, bones, and organs.  *See* MYALGIA, JOHNS HOPKINS MEDICINE, https://www.hopkinsmedicine.org/health/conditions-and-diseases/myalgia, (last visited Aug. 20, 2020).  "Injuries, trauma, overuse, tension, certain drugs and illnesses can all bring about myalgia."  *Id.*

Lumbrosacral neuritis is the irritation and/or inflammation of the spinal nerves in the lower back.  *See* Melissa Bell, LUMBROSACRAL NEURITIS – SYMPTOMS AND TREATMENT OPTIONS, THE HEALTH AND SCIENCE JOURNAL, https://www.thehealthsciencejournal.com/lumbosacral-neuritis-symptoms-and-treatment-options/, (last visited Aug. 20, 2020).

minutes), Roman needs to stand or walk for less than 15 minutes before returning

to a seated position.  While sitting, it is medically necessary for both of his legs to be

elevated to minimize pain.  *Id.* at 842–43.  Moreover, after standing or walking for

the maximum continuous period (less than 15 minutes), Roman needs to lie down or

recline for less than 15 minutes.  *Id.*  Additionally, Dr. Themistocle opined that the

total cumulative time that Roman can sit, stand, or walk during an eight-hour

workday is less than an hour.  *Id.* at 843–44.  The maximum weight that Roman

can carry is five pounds and he can only do so occasionally.  *Id.* at 845.  In addition,

Dr. Themistocle found that Roman requires a cane to aid him in both walking and

standing on all surfaces and terrains.  *Id.* at 846.  On average, Dr. Themistocle

reported that Roman would likely be absent from work about three times a month

as a result of his impairments.  *Id.* at 847.

### iii.    Sharon Chu, M.D.—Consultative Examiner

On April 10, 2018, Dr. Sharon Chu opined on Roman's physical condition but

explained that her findings were based on a one-time examination of Roman.  *Id.* at

1047.  She reported that Roman's depression and anxiety affect his pain, he

frequently experiences pain severe enough to interfere with attention and

concentration, and his medication causes him to feel drowsy.  *Id.* at 1043.[13]  Dr. Chu

reported a marked limitation in Roman's ability to deal with work stress.  *Id.*

She found that Roman can sit for 15 minutes before needing to alternate positions

by standing or walking for 30 minutes, *id.* at 1043, and determined that it was

---

[13] The first few pages of the opinion appear to be missing from the AR.

medically necessary for Roman to elevate both legs while sitting to minimize pain, *id*. at 1044. She determined that, after standing or walking about for 30 minutes, Roman needs to alternate postures and that sitting in a working position at a desk or table for 15 minutes is sufficient. *Id*. In total, Dr. Chu found that Roman would need to lie down or recline in a supine position for two hours in an eight-hour workday. *Id*. at 1045. Dr. Chu specified that her evaluation as to Roman's abilities to sit, stand, and walk were based on Roman's self-reporting. *Id*.

Dr. Chu also found that Roman can carry or lift 1–5 pounds frequently and 6–10 pounds occasionally. *Id*. She opined that he should never balance on level terrain, stoop, or flex or rotate his neck. *Id*. Roman is occasionally able to reach, handle, and finger with both hands. *Id*. at 1046. Although Roman forgot his cane on the day of his examination because he was rushing out of the house, Dr. Chu opined that Roman requires a cane to aid in walking or standing based on his self-reporting. *Id*. 1005–07. She also found that Roman is likely to be absent from work more than three times a month as a result of his impairments. *Id.* at 1047. Dr. Chu noted, however, that it was "difficult to fully assess [Roman's] disability" and that he would benefit from a more-detailed evaluation from an occupational physician. *Id*.

### iv.   Arlene Rupp-Goolnick, Ph.D.—Consultative Examiner

Arlene Rupp-Goolnick, Ph.D. completed a psychiatric evaluation for Roman on December 23, 2015. *Id*. at 706–10. Roman stated that he has difficulty falling asleep but that medication helps. *Id*. at 707. He also reported depressive and anxiety symptoms and, on occasion, short-term memory deficits. *Id*. Dr. Rupp-

Goolnick tested Roman's attention, concentration and memory skills; all were found intact as he was able to do calculations and recall exercises.  *Id.* at 708.

Dr. Rupp-Goolnick found no evidence of limitation in Roman's abilities to follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks, perform complex tasks independently, make appropriate decisions, relate adequately with others, and appropriately deal with stress.  *Id.* at 708–09. She reported that Roman's symptoms appeared to be consistent with psychiatric problems but were not significant enough to interfere with his ability to function on a daily basis.  *Id.* at 709.  In particular, she found Roman was able to prepare food using the microwave and make sandwiches, help his wife with cleaning, laundry, shopping, and managing money, and take public transportation.  *Id.* at 708.  She diagnosed Roman with depressive disorder and gave a "guarded" prognosis.  *Id.* at 709.

### v.   T. Inman-Dundon, Ph.D.—State Agency Medical Consultant

On December 31, 2015, Dr. Inman-Dundon conducted a physical residual function capacity assessment, based on the opinions of Drs. Rupp-Goolnick and Archbald.  *Id.* at 209–10.  Dr. Inman-Dundon found that Roman could lift or carry 20 pounds occasionally and 10 pounds frequently.  *Id.* at 209.  She further opined that Roman could stand or walk for a total of about six hours in an eight-hour workday and sit for more than six hours in an eight-hour workday.  *Id.*  No limitations were assessed in Roman's abilities to balance, stoop, kneel, crouch or

crawl, and occasional limitations were found in his ability to climb ramps, stairs, ladders, ropes and scaffolds.  *Id*. at 209–10.

Dr. Inman-Dundon also evaluated Roman's mental residual functional capacity.  *Id*. at 210–12.  She found Roman had no limitations in his ability to carry out very short and simple instructions.  *Id*. at 211.  She also found no significant limitations in Roman's abilities to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being distracted by them, make simple work-related decisions, and complete a normal workday and workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods.  *Id*. at 211.  Moderate limitations were found in Roman's ability to respond appropriately to changes in the work setting.  *Id*. at 212.  Overall, Dr. Inman-Dundon opined that Roman would be able to sustain unskilled and semi-skilled work.  *Id*.

### vi.    Joao Nunes, M.D.—Treating Psychiatrist

Dr. Joao Nunes completed a medical source statement on June 10, 2016.  *Id*. at 792–96.  Dr. Nunes diagnosed Roman with bipolar 1 disorder with clinical findings showing moderately impaired attention and focus, irritability, poor sleep, anxiousness, and a depressed mood.  *Id*. at 792–93.  He reported that Roman experienced no side effects from his medications.  *Id*. at 793.  Dr. Nunes opined that

Roman's impairments would cause him to be absent from work more than three times a month. *Id*. at 793. He described an extreme impairment in Roman's ability to "[w]ork in coordination with or proximity to others without being unduly distracted." *Id*. at 794. Dr. Nunes also found marked deficiencies in Roman's ability to (i) remember locations and work-like procedures; (ii) understand and remember detailed instructions; (iii) carry out detailed instructions; (iv) maintain attention and concentration for extended periods; (v) complete a normal workday or workweek without interruptions from psychologically based symptoms; and (vi) perform at a consistent pace without an unreasonable number and length of rest periods. *Id*. at 794. In addition, Dr. Nunes assessed marked losses in Roman's ability to ask simple questions or request assistance and respond appropriately to changes in a routine work setting. *Id*. at 795. Dr. Nunes also found that Roman was moderately limited in activities of daily living and maintaining social functioning, with frequent deficiencies in concentration, persistence, or pace and repeated episodes of deterioration or decompensation in work or work-like settings. *Id*. at 795–96. Dr. Nunes reported that these restrictions had existed since November 17, 2015. *Id*. at 796.

### vii.   Hun Han, M.D.—FEDCAP Evaluator

On November 29, 2016, Dr. Hun Han conducted a FEDCAP Rehabilitation Services, Inc. ("FEDCAP") intake evaluation and noted that Roman was ambulating slowly with a back brace and knee braces but no assistive device, *id*. at 816, and was morbidly obese with a BMI of 41.95, *id*. at 828. He opined that Roman was

23

limited to lifting, pushing and pulling 10 pounds, and standing and walking between one to three hours.  *Id*. at 832–33.  He also assessed that Roman required frequent breaks and was limited in his abilities to lift, push, pull, carry, bend, and reach.  *Id*. at 834–35.  Dr. Han determined that Roman was unable to work, explaining that his history of hospitalizations, outpatient care, and chronic mental illnesses restrict his daily activities and prevent adherence to a regular work routine, which in turn "prevents employment."  *Id*. at 840.

### viii.    Darryl C. Smith, M.D.—Treating Psychiatrist

Dr. Darryl Smith completed two medical source statements on behalf of Roman on September 20, 2017 and April 9, 2018.  *Id*. at 797–800, 1040–42.  In his September 20, 2017 statement, Dr. Smith diagnosed Roman with bipolar disorder and PTSD, and identified numerous symptoms including sleep and mood disturbance, personality change, recurrent panic attacks, difficulty thinking and concentrating, intrusive recollections of a traumatic experience, generalized persistent anxiety, and appetite disturbance with weight change.  *Id* at 797.  Roman appeared "calm, pleasant, and somewhat anxious," and denied dizziness, drowsiness, and fatigue.  *Id*. at 798.

Dr. Smith anticipated that Roman's impairments would cause him to be absent from work more than three times a month.  *Id*.  Dr. Smith concluded that Roman's ability to understand, remember, and carry out instructions are affected by his impairments and noted "extreme loss" in his ability to work with or near others without being unduly distracted, and "marked loss" in his ability to remember

locations and work-like procedures, carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday or week without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods.  *Id*. at 798–99.  Moreover, Dr. Smith found "marked loss" in his ability to respond appropriately to change in a routine work setting, travel in unfamiliar places, and set realistic goals or make plans independently of others.  *Id*.  Roman also had marked restriction of activities of daily living, extreme difficulties in maintaining social functioning, constant deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner, and continual episodes of deterioration or decompensation in work or work-like settings that cause withdrawal from the situation or exacerbate signs and symptoms.  *Id*. at 800.  According to Dr. Smith, Roman's impairments and the attendant restrictions existed as of November 17, 2015.  *Id*.

In his April 9, 2018 medical source statement, Dr. Smith again concluded that Roman's impairments would cause him to be absent from work more than three times a month, but this time noted that his ability to understand, remember, and carry out instructions would not be affected by his impairments.  *Id*. at 1040.[14] Dr. Smith assessed marked limitations in activities of daily living and in maintaining social functioning, frequent deficiencies of concentration, persistence or

---

[14] The first page of this opinion is missing from the record.

pace resulting in failure to complete tasks in a timely manner, and repeated episodes of deterioration or decompensation. *Id.* at 1042. In addition, he noted that Roman's medications were causing fatigue and drowsiness, and his "depressed mood has led to morbid obesity which impairs his ability to be employed." *Id.* at 1040.

### 3. ALJ Hearing

Roman appeared with his counsel at a video hearing before the ALJ on May 3, 2018, at which testimony was taken from Roman and Vocational Expert ("VE") Jody Kilpatrick. *Id.* at 123. Roman testified that his daily activities include mostly "laying down because . . . [he is] in extreme pain." *Id.* at 127. He explained that he cannot even make a sandwich without his back tensing up due to pain from standing and therefore his wife or his son prepare his food. *Id.* at 127–28.

As to his employment, Roman testified that he stopped working in 2005 and provided three reasons why he cannot work now. *Id.* at 127. First, Roman explained that is taking at least eight different types of medications, some of which he takes at least three times a day, that cause tiredness, dizziness, and "in some cases, [he is] pretty much incoherent." *Id.* at 136. He also stated that the medications make him "lethargic." *Id.* at 144.

Second, Roman claimed that he had six bulging discs in his neck and back that prevent him from sitting, standing, or walking for "too long." *Id.* at 137. If he does any of those three activities, he testified his back tightens up "at which point [he has] to lay down so that [his] spine can decompress." *Id.* at 137. Roman denied being able to stand for more than 15 minutes or sit for more than an hour at a time

without needing a break to allow for his back to decompress.  *Id*. 141–43.[15]  Roman takes prescription medication and received several spinal injections to manage his pain, and uses a cane and bilateral knee braces to assist with walking.  *Id*. at 138, 140, 144.  Finally, Roman testified that his sleep apnea causes him to wake up at least three or four times a night due to trouble breathing.  *Id*. at 139–140.  As a result, Roman finds himself tired the next day, losing focus and concentration, and at times nodding off.  *Id*. at 140, 143–44.

The ALJ questioned VE Kilpatrick regarding the employment opportunities available to a hypothetical person limited to (1) sedentary work, (2) standing or walking in up to 15-minute increments at a time after which the person can sit for 3 minutes, and (3) sitting for 30 minutes while able to change position at the work station for 2 to 3 minutes while remaining on task.  *Id*. at 149.  Kilpatrick opined that someone with this profile could perform work as a stuffer, lens inserter, or call out operator.  *Id*. at 149–50.  The ALJ described additional hypothetical limitations (*i.e.* that the person requires a stepstool under his or her workstation to be used while they were seated, or a cane to ambulate to and from the workstation), and Kilpatrick responded that the previously mentioned jobs would accommodate those limitations.  *Id*. at 150.

---

[15] During the hearing, Roman asked if he could stand up for a few minutes because his back was tightening up.  *Id*. at 143.

## II.   DISCUSSION

### A. Legal Standards

#### 1.   Judicial Review of Commissioner's Determinations

An individual may obtain judicial review of a final decision of the Commissioner in the "district court of the United States for the judicial district in which the plaintiff resides." 42 U.S.C. § 405(g). The district court must determine whether the Commissioner's final decision applied the correct legal standards and whether it is supported by substantial evidence. *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (internal quotation marks and alterations omitted); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) ("under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations . . . whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high").

The substantial evidence standard is a "very deferential standard of review." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012). The Court "must be careful not to substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review." *DeJesus v. Astrue*, 762 F. Supp. 2d 673, 683 (S.D.N.Y. 2011) (quoting *Jones v. Sullivan*, 949

F.2d 57, 59 (2d Cir. 1991)) (internal quotation marks and alterations omitted).

"[O]nce an ALJ finds facts, [a court] can reject those facts 'only if a reasonable

factfinder would have to conclude otherwise.'" *Brault*, 683 F.3d at 448 (quoting

*Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis omitted).

In weighing whether substantial evidence exists to support the

Commissioner's decision, "the reviewing court is required to examine the entire

record, including contradictory evidence and evidence from which conflicting

inferences can be drawn." *Selian*, 708 F.3d at 417 (quoting *Mongeur v. Heckler*, 722

F.2d 1033, 1038 (2d Cir. 1983)).  On the basis of this review, the court may "enter,

upon the pleadings and transcript of the record, a judgment affirming, modifying, or

reversing the decision of the Commissioner of Social Security, with or without

remanding . . . for a rehearing."  42 U.S.C. § 405(g).

In certain circumstances, the court may remand a case solely for the

calculation of benefits, rather than for further administrative proceedings.  "In . . .

situations[ ] where this Court has had no apparent basis to conclude that a more

complete record might support the Commissioner's decision, [the court has] opted

simply to remand for a calculation of benefits."  *Michaels v. Colvin*, 621 F. App'x 35,

38–39 (2d Cir. 2015) (summary order) (quoting *Rosa v. Callahan*, 168 F.3d 72, 83

(2d Cir. 1999)) (internal quotation marks omitted).  The court may remand solely for

the calculation of benefits when "the records provide[ ] persuasive evidence of total

disability that render[s] any further proceedings pointless." *Williams v. Apfel*, 204

F.3d 48, 50 (2d Cir. 1999).  However, "[w]hen there are gaps in the administrative

record or the ALJ has applied an improper legal standard, [the court has], on numerous occasions, remanded to the [Commissioner] for further development of the evidence." *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996) (quoting *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)) (alteration in original).

### 2. Commissioner's Determination of Disability

Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A). Physical or mental impairments must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In assessing a claimant's impairments and determining whether they meet the statutory definition of disability, the Commissioner "must make a thorough inquiry into the claimant's condition and must be mindful that 'the Social Security Act is a remedial statute, to be broadly construed and liberally applied.'" *Mongeur*, 722 F.2d at 1037 (quoting *Gold v. Sec'y of H.E.W.*, 463 F.2d 38, 41 (2d Cir. 1972)). Specifically, the Commissioner's decision must take into account factors such as: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or

others; and (4) the claimant's educational background, age, and work experience."
*Id.* (citations omitted).

### a. Five-Step Inquiry

"The Social Security Administration has outlined a 'five-step, sequential evaluation process' to determine whether a claimant is disabled[.]" *Estrella v. Berryhill*, 925 F.3d 90, 94 (2d Cir. 2019) (citations omitted); 20 C.F.R. § 404.1520(a)(4). First, the Commissioner must establish whether the claimant is presently employed. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is unemployed, at the second step the Commissioner determines whether the claimant has a "severe" impairment restricting her ability to work. 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant has such an impairment, the Commissioner moves to the third step and considers whether the medical severity of the impairment "meets or equals" a listing in Appendix One of Subpart P of the regulations. 20 C.F.R. § 404.1520(a)(4)(iii). If so, the claimant is considered disabled. *Id.*; 20 C.F.R. § 404.1520(d). If not, the Commissioner continues to the fourth step and determines whether the claimant has the residual functional capacity ("RFC") to perform her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). Finally, if the claimant does not have the RFC to perform past relevant work, the Commissioner completes the fifth step and ascertains whether the claimant possesses the ability to perform any other work. 20 C.F.R. § 404.1520(a)(4)(v).

The claimant has the burden at the first four steps. *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008). If the claimant is successful, the burden shifts to the

Commissioner at the fifth and final step, where the Commissioner must establish that the claimant has the ability to perform some work in the national economy. *See Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

### b. Duty to Develop the Record

"Social Security proceedings are inquisitorial rather than adversarial." *Sims v. Apfel*, 530 U.S. 103, 110–11 (2000). Consequently, "the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation marks omitted). As part of this duty, the ALJ must "investigate the facts and develop the arguments both for and against granting benefits." *Sims*, 530 U.S. at 111. Specifically, under the applicable regulations, the ALJ is required to develop a claimant's complete medical history. *Pratts*, 94 F.3d at 37 (citing 20 C.F.R. §§ 404.1512(d)–(f)). This responsibility "encompasses not only the duty to obtain a claimant's medical records and reports but also the duty to question the claimant adequately about any subjective complaints and the impact of the claimant's impairments on the claimant's functional capacity." *Pena v. Astrue*, No. 07-CV-11099 (GWG), 2008 WL 5111317, at *8 (S.D.N.Y. Dec. 3, 2008) (citations omitted).

Whether the ALJ has satisfied this duty to develop the record is a threshold question. Before determining whether the Commissioner's final decision is supported by substantial evidence under 42 U.S.C. § 405(g), "the court must first be satisfied that the ALJ provided plaintiff with 'a full hearing under the Secretary's

regulations' and also fully and completely developed the administrative record." *Scott v. Astrue*, No. 09-CV-3999 (KAM) (RLM), 2010 WL 2736879, at *12 (E.D.N.Y. July 9, 2010) (quoting *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)); *see also Rodriguez v. Barnhart*, No. 02-CV-5782 (FB), 2003 WL 22709204, at *3 (E.D.N.Y. Nov. 7, 2003) ("The responsibility of an ALJ to fully develop the record is a bedrock principle of Social Security law.") (citing *Brown v. Apfel*, 174 F.3d 59 (2d Cir. 1999)).   The ALJ must develop the record even where the claimant has legal counsel.  *See, e.g.*, *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996).  Remand is appropriate where this duty is not discharged.  *See, e.g., Moran*, 569 F.3d at 114–15 ("We vacate not because the ALJ's decision was not supported by substantial evidence but because the ALJ should have developed a more comprehensive record before making his decision.").

### c.  Treating Physician's Rule

"Regardless of its source, the ALJ must evaluate every medical opinion in determining whether a claimant is disabled under the [Social Security] Act." *Pena ex rel. E.R. v. Astrue*, No. 11-CV-1787 (KAM), 2013 WL 1210932, at *14 (E.D.N.Y. Mar. 25, 2013) (citing 20 C.F.R. §§ 404.1527(c), 416.927(d)) (internal quotation marks omitted).[16]  A treating physician's opinion is given controlling weight,

---

[16] Revisions to the regulations in 2017 included modifying 20 C.F.R. § 404.1527 to clarify and add definitions for how to evaluate opinion evidence for claims filed before March 27, 2017.  *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5869–70 (Jan. 18, 2017).  Accordingly, this opinion and order applies the regulations that were in effect when Roman's claims were filed with the added clarifications provided in the 2017 revisions.

provided the opinion as to the nature and severity of an impairment "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2); 416.927(d)(2).  The regulations define a treating physician as the claimant's "own physician, psychologist, or other acceptable medical source who provides [the claimant] . . . with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]."  20 C.F.R. § 404.1502.  Deference to such medical providers is appropriate because they "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical evidence alone or from reports of individual examinations."  20 C.F.R. §§ 404.1527(c)(2); 416.927(d)(2).

A treating physician's opinion is not always controlling.  For example, a legal conclusion "that the claimant is 'disabled' or 'unable to work' is not controlling," because such opinions are reserved for the Commissioner.  *Guzman v. Astrue*, No. 09-CV-3928 (PKC), 2011 WL 666194, at *10 (S.D.N.Y. Feb. 4, 2011) (citing 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1)); *accord Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("A treating physician's statement that the claimant is disabled cannot itself be determinative.").  Additionally, where "the treating physician issued opinions that [were] not consistent with other substantial evidence in the record, such as the opinion of other medical experts, the treating physician's opinion is not afforded

controlling weight." *Pena ex rel. E.R.*, 2013 WL 1210932, at *15 (quoting *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)) (internal quotation marks omitted) (alteration in original); *see also Snell*, 177 F.3d at 133 ("[T]he less consistent [the treating physician's] opinion is with the record as a whole, the less weight it will be given.").

Importantly, however, "[t]o the extent that [the] record is unclear, the Commissioner has an affirmative duty to 'fill any clear gaps in the administrative record' before rejecting a treating physician's diagnosis." *Selian*, 708 F.3d at 420 (quoting *Burgess*, 537 F.3d at 129); *see Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) (discussing ALJ's duty to seek additional information from treating physician if clinical findings are inadequate). As a result, "the 'treating physician rule' is inextricably linked to a broader duty to develop the record. Proper application of the rule ensures that the claimant's record is comprehensive, including all relevant treating physician diagnoses and opinions, and requires the ALJ to explain clearly how these opinions relate to the final determination." *Lacava v. Astrue*, No. 11-CV-7727 (WHP) (SN), 2012 WL 6621731, at *13 (S.D.N.Y. Nov. 27, 2012) ("In this Circuit, the [treating physician] rule is robust."), *adopted by* 2012 WL 6621722 (Dec. 19, 2012).

To determine how much weight a treating physician's opinion should carry, the ALJ must consider the so-called "*Burgess* factors" outlined by the Second Circuit:

> (i) the frequency of examination and the length, nature and extent of the treatment relationship;

> (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

*Halloran*, 362 F.3d at 32 (citation omitted); see also *Burgess*, 537 F.3d at 129; 20 C.F.R. § 404.1527(c)(2).  This determination is a two-step process.  "First, the ALJ must decide whether the opinion is entitled to controlling weight."  *Estrella*, 925 F.3d at 95.  Second, if, based on these considerations, the ALJ declines to give controlling weight to the treating physician's opinion, the ALJ must nonetheless "comprehensively set forth reasons for the weight" ultimately assigned to the treating source.  *Halloran*, 362 F.3d at 33; *accord Snell*, 177 F.3d at 133 (responsibility of determining weight to be afforded does not "exempt administrative decisionmakers from their obligation . . . to explain why a treating physician's opinions are not being credited") (referring to *Schaal*, 134 F.3d at 505 and 20 C.F.R. § 404.1527(d)(2)).  If the ALJ decides the opinion is not entitled to controlling weight, "[a]n ALJ's failure to 'explicitly' apply these 'Burgess factors' when [ultimately] assigning weight at step two is a procedural error."  *Estrella*, 925 F.3d at 96 (quoting *Selian*, 708 F.3d at 419–20).  The regulations require that the SSA "always give good reasons in [its] notice of determination or decision for the weight" given to the treating physician.  *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998) (alteration in original) (citations omitted).  Indeed, "[c]ourts have not hesitate[d] to remand [cases] when the Commissioner has not provided good

36

reasons." *Pena ex rel. E.R.*, 2013 WL 1210932, at *15 (quoting *Halloran*, 362 F.3d at 33) (second and third alteration in original) (internal quotation marks omitted).

### d. Claimant's Credibility

An ALJ's credibility finding as to the claimant's disability is entitled to deference by a reviewing court. *Osorio v. Barnhart*, No. 04-CV-7515 (DLC), 2006 WL 1464193, at *6 (S.D.N.Y. May 30, 2006). "[A]s with any finding of fact, '[i]f the Secretary's findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints." Id. (quoting *Aponte v. Sec'y of Health and Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984)). Still, an ALJ's finding of credibility "must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record." *Pena*, 2008 WL 5111317, at *10 (internal quotation marks omitted) (quoting *Williams v. Bowen*, 859 F.2d 255, 260–61 (2d Cir. 1988)). "The ALJ must make this [credibility] determination 'in light of the objective medical evidence and other evidence regarding the true extent of the alleged symptoms.'" *Id.* (quoting *Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir. 1984)).

SSA regulations provide that statements of subjective pain and other symptoms alone cannot establish a disability. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(a)). Accordingly, the ALJ must follow a two-step framework for evaluating allegations of pain and other limitations. *Id.* First, the ALJ considers whether the claimant suffers from a "medically determinable impairment that could reasonably be expected to produce" the symptoms alleged.

*Id*. (citing 20 C.F.R. § 404.1529(b)).  "If the claimant does suffer from such an

impairment, at the second step, the ALJ must consider 'the extent to which [the

claimant's] symptoms can reasonably be accepted as consistent with the objective

medical evidence and other evidence' of record."  *Id*. (citing 20 C.F.R. § 404.1529(a)).

Among the kinds of evidence that the ALJ must consider (in addition to objective

medical evidence) are:

> 1. The individual's daily activities; 2. [t]he location,
> duration, frequency, and intensity of the individual's pain
> or other symptoms; 3. [f]actors that precipitate and
> aggravate the symptoms; 4. [t]he type, dosage,
> effectiveness, and side effects of any medication the
> individual takes or has taken to alleviate pain or other
> symptoms; 5. [t]reatment, other than medication, the
> individual receives or has received for relief of pain or
> other symptoms; 6. [a]ny measures other than treatment
> the individual uses or has used to relieve pain or other
> symptoms (e.g., lying flat on his back, standing for 15 to
> 20 minutes every hour, or sleeping on a board); and 7.
> [a]ny other factors concerning the individual's functional
> limitations and restrictions due to pain or other
> symptoms.

*Pena*, 2008 WL 5111317, at *11 (citing SSR 96-7p, 1996 WL 374186, at *3 (SSA July

2, 1996)).

**B.  The ALJ's Decision**

In a 14-page decision dated July 30, 2018, the ALJ concluded that Roman

was not disabled as defined by the Social Security Act.  AR at 29.  Following the

five-step inquiry, at step one the ALJ found that Roman had not been engaged in

substantial gainful activity since October 7, 2015, the date of Roman's application.

*Id*. at 18.  At step two, the ALJ found that Roman had the following severe

impairments: bilateral rotator cuff tendinitis, degenerative disc disease, asthma, obesity, panic disorder, sleep apnea, post-traumatic stress disorder, and Wolff-Parkinson-White syndrome.  *Id*.

At step three, the ALJ found that none of Roman's impairments met or equaled the severity of the listings.  *Id*. at 19–20.  As to listings 1.02, 1.04, and 3.02, the ALJ determined that Roman's treatment records do not establish that he was "unable to perform fine and gross movements effectively," "had sensory or reflex loss or [a] positive straight leg raise test," or that his asthma (which was stable and controlled with an inhaler) "resulted in exacerbations or complications requiring three hospitalizations in a 12-month period."  *Id*. at 19.  In reaching this conclusion, the ALJ briefly evaluated Roman's obesity pursuant to the guidelines set forth in SSR 02-01p and "found that the functional effects of [Roman's] obesity do not combine with his other impairments to meet or equal any medical listing."  *Id*.  The ALJ also found that the severity of Roman's mental impairments did not meet or equal the criteria of listings 12.04 and 12.15, as his impairments only presented a mild limitation in his ability to understand, remember, or apply information, and moderate limitations in his ability to interact with others, adapt or manage himself, and concentrate, persist, or maintain pace.  *Id*. at 19–20.

Prior to evaluating step four, the ALJ determined Roman's RFC.  She concluded that Roman was able to perform sedentary work subject to the following limitations:

> the claimant [can] stand or walk in up to fifteen minute
> increments at a time, after which he can sit for 3 minutes;

> after sitting for 30 minutes he may change position at the
> work station for 2–3 minutes while remaining on task; he
> can occasionally climb ramps and stairs, but generally
> just a few steps, rarely full flights, but he can never climb
> ladders, ropes, or scaffolds. The claimant can occasionally
> balance and stoop, but he can never kneel, crouch, or
> crawl. The claimant cannot perform receptive extreme
> neck movement such as flexion, extension or rotation,
> with repetitive defined as more than 10 times per hour
> and extreme defined as all the way up to the ceiling or
> down to the floor or all the way to the left or right. The
> claimant can frequently reach, but he can occasionally
> perform overhead reaching. The claimant can frequently
> perform handling and fingering. The claimant must avoid
> concentrated exposure to extreme temperatures, avoid
> even moderate exposure to pulmonary irritants, and avoid
> all exposure to hazardous machinery, unprotected heights
> and operational control of moving machinery. The
> claimant may use a step stool up to 6 inches in height
> under his work station while seated; and may use a cane
> to ambulate to and from the work station. The claimant
> can perform simple, routine and repetitive tasks, svp1 or
> 2, but he cannot perform conveyor belt work. The
> claimant can perform low stress work defined as only
> occasional decision-making and changes in the work
> setting. The claimant can only occasionally interact with
> the public, his coworkers and supervisors.

*Id*. at 21.

In formulating Roman's RFC, the ALJ summarized his treatment history and weighed the opinions of a number of medical sources. *Id*. The ALJ found that Roman's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but his statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the evidence in the record. *Id*. at 22. Specifically, the ALJ found that the treatment notes related to Roman demonstrated that he did not appear to be in any acute

distress, had a normal to mildly antalgic gait, and had only limited difficulties during his physical examinations.  *Id.* at 22–23.

In evaluating the medical opinions, the ALJ accorded "significant weight" to the opinions of SSA evaluator Dr. Inman-Dundon—who opined that Roman could perform unskilled to semi-skilled work and had mild limitations in his daily activities, his ability to concentrate, persist, and maintain pace, and his ability to maintain his social functioning—and consultative examiner Dr. Rupp-Goolnick—who opined that Roman was capable of performing simple and complex tasks independently, maintaining his attention and concentration, relating adequately with others, and appropriately dealing with stress.  *Id.* at 25–26.

The ALJ accorded "some weight" to Dr. Themistocle's opinion that Roman could perform sedentary work but required rest throughout the day and a cane to ambulate because Dr. Themistocle's opinion was "too restrictive" compared to treatment records reflecting that Roman was able to ambulate with a normal gait, without the use of a cane, and rarely reported fatigue.  *Id.* at 27.  For the same reasons, the ALJ gave "little weight" to Dr. Chu's report finding that Roman could do sedentary work but needed a cane and additional rest.  *Id.*  Moreover, the ALJ accounted for Dr. Chu's admission that it was difficult to assess Roman's limitations based on meeting him only once.  *Id.*  The ALJ accorded "some weight" to Dr. Archbald's opinion—which found marked limitations in Roman's ability to kneel, bend, and climb stairs and moderate limitations in his ability to lift and carry—because it was consistent with Dr. Archbald's examination notes.  *Id.* at 26.

41

The opinions of Drs. Nunes and Smith were given "little weight." *Id.*  The ALJ found that Dr. Nunes's check-off form opinion, in which he found that Roman had moderate limitations in daily activities and social functioning and frequent deficiencies in maintaining concentration, persistence and pace, was inconsistent with medical evidence that showed Roman could prepare meals, perform household chores, shop, manage his finances, travel on public transportation, and tend to self-care tasks.  *Id.*  As for Dr. Smith's opinion, the ALJ found it to be too restrictive and inconsistent with his own treatment notes reflecting a "generally benign" mental assessment.  *Id.*

At step four, the ALJ found that Roman does not have past relevant work. *Id.* at 27.  At step five, after considering the VE's testimony and Roman's demographic information, the ALJ concluded that there were jobs that exist in significant numbers that he could perform, such as stuffer, lens inserter, or call out operator.  *Id.* at 28.  Accordingly, the ALJ concluded that Roman was not disabled from October 7, 2015 through the date of her decision.  *Id.* at 29.

## C. Analysis

Roman contends that the ALJ committed several errors by denying his application for SSI.  First, he argues that the ALJ did not apply the correct legal standard when determining what weight to grant the opinions of Drs. Themistocle, Nunes, and Smith, and that their opinions were supported by substantial evidence in the record.  Pl. Mem. at 18–20.  Next, he claims that the ALJ erred in the assessment of his credibility.  *Id.* at 20–22.  Finally, he contends that the ALJ erred

by not properly considering his obesity and the side effects of his medications when determining his physical and mental limitations. *Id.* at 22–24. For the reasons that follow, the Court concludes that the ALJ violated the treating physician rule.

### 1. The ALJ Violated the Treating Physician Rule as to Dr. Themistocle

Roman argues that the ALJ violated the treating physician rule by giving only "some weight" to Dr. Themistocle's opinion because it is supported by evidence in the record, including treatment notes, MRIs, opinions of medical professionals, and Roman's own testimony. *Id.* at 19. The Commissioner counters that the ALJ provided good reasons for not giving Dr. Themistocle's opinion more weight: the opinion was inconsistent with evidence in the record and, in particular, other physicians' findings. Def. Mem. at 17. After carefully reviewing the record, the Court finds that the reasons given by the ALJ in assigning less-than-controlling weight to Dr. Themistocle's opinion were inadequate.

As an initial matter, Dr. Themistocle, who provided pain management treatment to Roman and saw him at least eight times from 2015 to 2016, is properly characterized as a treating physician, and the parties do not contend otherwise. AR at 1067–1101. Accordingly, in affording Dr. Themistocle's opinion less than controlling weight, the ALJ was required to "comprehensively set forth reasons for the weight" and explicitly apply the *Burgess* factors. *Halloran*, 362 F. 3d at 33. While the Second Circuit "does not require 'slavish recitation of each and every factor,' the ALJ's 'reasoning and adherence to the regulation' still must be clear from [her] opinion." *Cabrera v. Comm'r of Soc. Sec.*, No. 16-CV-4311 (AT) (JLC),

2017 WL 3686760, at *3 (S.D.N.Y. Aug. 25, 2017) (citing *Atwater v. Astrue*, 512 F.

App'x. 67, 70 (2d Cir. 2013)).  If the ALJ does not "explicitly" consider these factors,

the case must be remanded unless "a searching review of the record" assures the

Court that the ALJ applied "the substance of the treating physician rule." *Estrella*,

925 F.3d at 95.

Here, the ALJ gave "some weight" to Dr. Themistocle's opinion that Roman

was "capable of performing a reduced range of sedentary work, but he was required

to ambulate with a cane, elevate his bilateral lower extremities, alternate positions .

. . [and] rest throughout the day, in addition to [taking] normal breaks."  AR at 27.

She found that the sedentary exertion portion of his opinion was supported by the

record, but his findings that Roman needed a cane to ambulate and to rest in

addition to normal breaks were too restrictive because they were inconsistent with

the treatment records reflecting that Roman was able to ambulate with "a normal

gait without the use of a cane and that he rarely reported fatigue."  *Id.* (citing *id.* at

703, 772, 824, 862–63, 892, 1005–06, 1015, 1019, 1099).

In weighing Dr. Themistocle's opinion, the ALJ erred by failing to consider all

of the *Burgess* factors.  *See Burgess*, 537 F.3d at 129 (quoting 20 C.F.R. § 404.1527);

*see also Halloran*, 362 F.3d at 32 ("An ALJ who refuses to accord controlling weight

to the medical opinion of a treating physician must consider various 'factors' to

determine how much weight to give to the opinion.").  First, the ALJ failed to

consider explicitly the frequency of examinations or the length, nature, and extent

of the treatment relationship between Dr. Themistocle and Roman.  By failing to do

44

so, the ALJ did not weigh the impact of Dr. Themistocle's regular observations of Roman during at least eight office visits between December 2015 and December 2016 on the merits of his opinion.  AR at 787–90, 1067–1101.  In light of this treatment history, Dr. Themistocle was more likely to obtain a longitudinal picture of Roman's condition than the consultative examiner Dr. Archbald, who met Roman only once in December 2015.  AR at 701–05; *see, e.g., Santiago v. Barnhart*, 441 F. Supp. 2d 620, 629 (S.D.N.Y. 2006) ("The Treating Physician Rule recognizes that a physician who has a long history with a patient is better positioned to evaluate the patient's disability than a doctor who observes the patient once for the purposes of a disability hearing.").

The ALJ also failed to consider Dr. Themistocle's specialization in pain management when weighing his opinion.  Indeed, the ALJ neither identified Dr. Themistocle as a pain management specialist nor discussed his specialization.  *See, e.g.*, *Marte v. Berryhill*, No. 17-CV-3567 (VSB) (JLC), 2018 WL 2979475, at *14 (S.D.N.Y. Jun. 14, 2018) (recommending remand for ALJ's failure to discuss treating physician's specialization in internal medicine), *adopted by* 2018 WL 5255170 (Oct. 22, 2018); *Craig v. Comm'r of Soc. Sec.*, 218 F. Supp. 3d 249, 266–67 (S.D.N.Y. Nov. 22, 2016) (ALJ's failure to consider factors such as specialization in assessing weight afforded to treating physician's medical opinion warranted remand); *Saldin v. Colvin*, No. 13-CV-4634 (ADS), 2014 WL 3828227, at *13–14 (E.D.N.Y. Aug. 4, 2014) (ALJ erred by failing to consider relevant factors including specialization of treating physician).

More significantly, the ALJ erred by failing to consider the consistency of Dr. Themistocle's opinion with other opinions and evidence in the record.  In her decision, the ALJ addressed the opinions of Dr. Themistocle and Dr. Chu together, observing that both opinions found the same limitations but ultimately assigning them "some weight" and "little weight," respectively, because they were inconsistent with the medical evidence in the record.  AR at 27.  However, "by considering—and rejecting—[Dr. Themistocle and Dr. Chu's] opinions *together*, the ALJ failed to give any weight to the fact that these opinions are consistent with other medical evidence in the record because *they are consistent with one another." Denver v. Berryhill*, No. 19-CV-1312 (AJN) (KHP), 2020 WL 2832752, at *2 (S.D.N.Y. June 1, 2020) (emphasis in original).

Moreover, it is not clear from the record that the ALJ properly considered the consistency of Roman's MRIs—which were ordered, and relied upon, by Dr. Themistocle to treat Roman's pain—with Dr. Themistocle's opinion.  *Id.* at 1071, 1073, 1075, 1081, 1088, 1098.  Although the ALJ properly described the MRIs as showing "degenerative disc disease," she failed to note that the MRIs also demonstrated that Roman had multiple herniated discs, moderate to severe foraminal narrowing, and acute facet inflammation.  *Id.* at 22, 691–92, 696–98.  These additional diagnoses based on Roman's MRIs appear to be consistent with Dr. Themistocle's finding of lower back pain in his opinion (*id.* at 841) and, in turn, may provide support for Dr. Themistocle's opinion as to Roman's limitations generally, including a "reduced range of sedentary work" (*id.* at 27).  In addition, the ALJ

mistakenly claimed that Dr. Themistocle's opinion that Roman required rest throughout the day was unsupported by the record because Roman did not report fatigue to multiple providers.  AR at 27.  This reasoning mischaracterizes the basis of Dr. Themistocle's opinion; Dr. Themistocle did not opine that Roman needed these extra breaks due to fatigue, but rather to relieve pain from chronic pain syndrome, myalgia, and other documented impairments.  *Id.* at 841, 844; *see also id.* at 142 (Roman testifying that he can only stand for about 15 minutes and requires breaks to decompress his back).

As to the remaining evidence that was considered, the ALJ cited various treatment notes to support her finding that Dr. Themistocle's opinion was too restrictive.  For example, she relied on the notes of two physicians—Drs. Archbald and Bernard—who reported that Roman had a normal gait to contradict Dr. Themistocle's opinion on this subject.  *Id.* at 27 (citing to *id.* at 703, 772).  However, the ALJ also cited to Dr. Arias's report that Roman had a "mildly antalgic gait," *id.* at 1019, and Dr. Themistocle's own observation of an "antalgic gait," *id.* at 1099, which tend to support Dr. Themistocle's opinion.  The ALJ also relied on reports that observed Roman without an assistive device or cane as evidence undermining Dr. Themistocle's opinion that he required a cane, *see, e.g., id.* at 27 (citing *id.* at 703, 1005), but failed to acknowledge that those reports noted Roman wearing bilateral knee braces and a back brace.  In sum, because the ALJ did not explicitly address the *Burgess* factors or otherwise provide good reasons for her weight

47

determination based on the evidence she *did* consider, the Court concludes that she

erred in giving Dr. Themistocle's opinion less than controlling weight.

This error is not harmless.   If the ALJ had credited Dr. Themistocle's opinion

that Roman needed more rest time in addition to periodic breaks every two hours,

*id.* at 844, for example, such accommodations may not be tolerated by an employer,

as the VE testified that it would "not be acceptable" for Roman to take five-minute

breaks every hour in addition to the regularly scheduled breaks.  *Id.* at 152.  At the

very least, the ALJ would need to elicit further information to determine whether

the number of breaks Roman requires would be acceptable to an employer.

Therefore, it cannot be said that the ALJ committed harmless error.  *See. e.g., Pines*

*v. Comm'r of Soc. Sec.*, No. 13-CV-6850 (AJN) (FM), 2015 WL 872105, at *10

(S.D.N.Y. Mar. 2, 2015) (not harmless error where "the [VE] essentially testified

that if [the treating physician's] opinions were adopted, [claimant] would be unable

to work") (quoting *Archambault v. Colvin*, No. 2:13-CV-292, 2014 WL 4723933, at

*10 (D. Vt. Sept. 23, 2014), *adopted by* 2015 WL 1381524 (Mar. 25, 2015)).

For these reasons, the ALJ failed to properly evaluate and consider the

*Burgess* factors before giving the opinion of Dr. Themistocle less than controlling

weight.  *See, e.g., Cabrera*, 2017 WL 3686760, at *3 (ALJ erred in not discussing

treating physician's specialization); *Ramos v. Comm'r of Soc. Sec,* No. 13-CV-3421

(KBF), 2015 WL 7288658, at *7 (S.D.N.Y. Nov. 16, 2015) (remanding where ALJ did

not consider specialization and length of treatment in weighing opinion of treating

physician); *Clark v. Astrue,* No. 08-CV-10389 (LBS), 2010 WL 3036489, at *4

(S.D.N.Y. Aug. 4, 2010) (failure to consider frequency of examination and length, nature, and extent of treatment relationship, or whether opinion was from specialist was "legal error [that] constitute[d] grounds for remand") (internal quotation marks omitted).  Remand is therefore appropriate in order for the ALJ to apply the *Burgess* factors and articulate "good reasons" for rejecting Dr. Themistocle's opinion (if that remains the determination after the record is further developed, as discussed below). *See, e.g., Pines*, 2015 WL 1381524, at *3 ("Due to the importance of the treating physician rule, the Second Circuit has made clear that it will 'not hesitate to remand when the Commissioner has not provided good reasons for the weight given to a treating physician's opinion and it will continue remanding when it encounters opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion.'") (alterations omitted) (quoting *Halloran*, 362 F.3d at 33).

## 2. The ALJ Violated the Treating Physician Rule as to Drs. Nunes and Smith

The Court next turns to the ALJ's weight determination as to the opinions of Drs. Nunes and Smith.  Roman contends that the ALJ erred by failing to consider that "Dr. Nunes's and Dr. Smith's opinions were [] based on longitudinal relationships with [] Roman."  Pl. Mem. at 19.  Roman also argues that the two psychiatrists' opinions "were well supported by their treatment notes and were consistent with each other and with Mr. Roman's testimony."  *Id.* at 20.  The Commissioner counters that the ALJ properly afforded little weight to the treating

psychiatrists' opinions because they were inconsistent with the record and Roman's medical status assessments were "generally benign."  Def. Mem. at 19–20.

It is uncontested that Drs. Nunes and Smith, who treated Roman for 17 and 8 months, respectively, are treating physicians.  AR at 783–86, 893–902, 906–08, 912–17, 924–26, 930–32, 942–44, 964–66, 980–83, 985–90, 994–95, 997–98, 999–1004.  As previously noted, in giving the treating psychiatrists' opinions less than controlling weight, the ALJ was required to "comprehensively set forth reasons for the weight" according to the *Burgess* factors.  *Halloran*, 362 F.3d at 33.

Here, the ALJ gave "little weight" to the opinion of Roman's treating psychiatrist, Dr. Nunes, who found moderate limitations in Roman's activities of daily living and his ability to maintain his social functioning; frequent deficiencies in maintaining his concentration, persistence, and pace; and repeated episodes of decompensation.  AR at 26.  In making this weight determination, the ALJ found that Dr. Nunes's opinion was inconsistent with the medical evidence in the record, including Roman's ability to prepare meals, perform household chores, shop, manage his finances, travel on public transportation and tend to his self-care tasks. *Id.* at 26.  The ALJ also gave "little weight" to Dr. Smith's September 2017 and April 2018 opinions, which characterized Roman's limitations as "marked to extreme limitations in the 'paragraph B' criteria."  *Id.*; *see also id.* at 800, 1040.  The ALJ reasoned that Dr. Smith's findings were too restrictive and inconsistent with the medical evidence in the record and Dr. Smith's own treatment notes wherein Roman's mental status assessments were "generally benign."  *Id.* at 26.

Although the ALJ considered some pertinent factors in affording little weight to the treating psychiatrists' opinions, the ALJ failed to "'explicitly' apply the *Burgess* factors" in reaching her determination, and "a searching review of the record" does not assure the Court that the ALJ "applied the substance of the treating physician rule." *Estrella*, 925 F.3d at 96. To begin with, the ALJ failed to consider the frequency of examination and the length, nature, and extent of Drs. Nunes's and Smith's treatment relationship with Roman. In her decision, the ALJ did not discuss Roman's near-monthly treatment with Dr. Nunes from November 2015 to April of 2017. AR at 783–86, 893–902, 906–08, 912–17, 924–26, 930–32, 942–44, 964–66. Nor did the ALJ acknowledge that Roman had received mental health treatment at MHHC, the hospital at which Dr. Nunes works, intermittently from April 2010 through June 2016. *Id.* at 612–14, 739–41, 743–45, 746–48, 749–52, 753–54, 884–89, 893–95, 903–05. The ALJ similarly failed to discuss Roman's monthly follow-up visits with Dr. Smith from July 2017 to March 2018 for his mental health disorders when evaluating Dr. Smith's opinions. *Id.* at 980–83, 985–90, 994–95, 997–98, 999–1004. Although the ALJ observed that Dr. Smith's treatment records for Roman span the period from July 2017 through March 2018 (*id.* at 25), the ALJ did not explicitly discuss this factor. *See, e.g., Estrella*, 925 F.3d at 96 ("An ALJ's failure to 'explicitly' apply the *Burgess* factors when assigning weight at step two is procedural error") (quoting *Selian*, 708 F.3d at 419–20). Consideration of this *Burgess* factor is particularly significant where, as here, the ALJ is evaluating a claimant's psychiatric impairments. *See, e.g., Rodriguez v.*

51

*Astrue*, No. 07-CV-534 (WHP) (MHD), 2009 WL 637154, at *26 (S.D.N.Y. Mar. 9, 2009) ("The mandate of the treating physician rule to give greater weight to the opinions of doctors who have a relationship with a plaintiff is particularly important in the mental-health context.").

Moreover, this error takes on added importance in light of the fact that the ALJ gave more weight to the opinions of consultative examiners (based on one-time examinations of Roman), *see* AR at 209–10, 706–10, than that of Roman's psychiatrists (based on treating Roman over a span of many months), as other courts have observed. *See, e.g., Santiago*, 441 F. Supp. 2d at 629 ("The [Treating Physician] rule is even more relevant in the context of mental disabilities, which by their nature are best diagnosed over time."); *Mongeur*, 722 F.2d at 1039 n.2 (medical opinion of a physician—who examined a claimant only "once or twice" and thus did not develop physician/patient relationship with him—is "not entitled to the extra weight of that of a 'treating physician'"); *see also* 20 C.F.R. § 404.1527(c)(2) (ALJ should generally "give more weight to" opinion of doctor who treated a claimant on an ongoing basis and thus could provide a "detailed, longitudinal picture of [the claimant's] medical impairment(s)," offering a more "unique perspective to the medical evidence" than provided by reports from "individual examinations, such as consultative examinations). Because the ALJ "should have considered, discussed, and compared the details of the treatment relationships between each physician and the plaintiff," but failed to do so, remand is warranted on this basis as well. *Scott*, 2010 WL 2736879, at *17 (remand warranted where

ALJ failed to "consider the length, frequency, nature and extent of the treating relationship of the different physicians in the record") (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)).

Additionally, the ALJ did not properly consider the evidence in support of Drs. Nunes's and Smith's opinions or the consistency of their opinions with the record as a whole.  Notably, the ALJ neglected to acknowledge that the opinions of Roman's treating psychiatrists reported similar limitations.  *Compare* AR at 795 (Dr. Nunes observed moderate restriction of activities of daily living; moderate difficulties in maintaining social functioning; frequent deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner; and repeated episodes of deterioration or decompensation) *with id.* at 800 (Dr. Smith's September 2017 opinion assessed marked restrictions of daily living; extreme difficulties in maintaining social functioning; and constant deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner; and continual episodes of deterioration or decompensation constant ), 1042 (Dr. Smith's April 2018 opinion found marked restrictions of daily living; marked difficulties in maintaining social functioning; frequent deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner; repeated episodes of deterioration or decompensation).  Both treating psychiatrists' opinions are also supported by FEDCAP Evaluator Dr. Han's report, which found Roman had a limited ability to sustain concentration, pace, and productivity, anxiety, mood swings, and a history of chronic mental illness that restricted his

daily activities and prevented adherence to a regular work routine. *Id.* at 834, 840. The ALJ also neglected to consider the consistency of Drs. Nunes's and Smith's opinions with the multiple diagnoses of bipolar disorder, PTSD, and depressive disorder found throughout the record. *Id.* at 709, 740, 793, 797, 901.

In addition, the ALJ improperly discounted Dr. Smith's opinions as inconsistent with his own treatment notes based on the conclusory interpretation that those treatment notes established Roman's mental status as "generally benign." *Id.* at 26. However, Dr. Smith's notes demonstrate that Roman had poor concentration, hypervigilance, chronic depression, constricted affect, and moderate aggression—symptoms severe enough that Dr. Smith continued to prescribe gabapentin and seroquel at doses previously increased by Dr. Nunes. *Id.* at 900, 982–83, 985–86, 989–90. Although, at a minimum, she should have provided a reasonably detailed explanation as to why she found Dr. Smith's treatment notes to support the conclusion that Roman's mental status assessment was "generally benign," the ALJ committed a more significant error by failing to identify explicitly the medical evidence that was inconsistent with Dr. Smith's opinions. AR at 26 (finding Dr. Smith's opinion as too restrictive and inconsistent with the record and referring generally to discussion in previous section of decision); *see, e.g., Sickler v. Colvin*, No. 14-CV-1411 (JCF), 2015 WL 1600320, at *12 (S.D.N.Y. Apr. 9, 2015) (conclusory statement that opinion is inconsistent with evidence in the record "does not 'comprehensively set forth [the ALJ's] reasons for the weight assigned to [the] treating physician's opinion'") (quoting *Burgess*, 539 F.3d at 129); *Serrano v. Colvin*,

No. 12-CV-7485 (PGG) (JLC), 2014 WL 197677, at *17 (S.D.N.Y. Jan. 17, 2014)

(failure to explain how treating physician's findings were inconsistent with other

medical opinions is a "bare and conclusory analysis [that] constitute[s] error"),

*adopted by* Order dated May 7, 2014 (Dkt. No. 22).

Finally, the ALJ neglected to consider Dr. Smith's specialization as a

psychiatrist.  Without any discussion of Dr. Smith's specialty, it is unclear whether

the ALJ gave any weight to Dr. Smith's opinion based on the fact that he is a

psychiatrist.  *See, e.g., Clark,* 2010 WL 3036489, at *4 (legal error where ALJ did

not explicitly consider whether opinion was from specialist); *Veresan v. Astrue,* No.

06-CV-5195 (JG), 2007 WL 1876499, at *5 (E.D.N.Y. June 29, 2007) (case remanded

where, among other errors, ALJ did not indicate what weight, if any, was assigned

based on fact that medical opinions were from specialists).

As with Dr. Themistocle, the ALJ's violation of the treating physician rule in

these circumstances is not harmless error.  Both Dr. Nunes's and Dr. Smith's

findings that Roman's mental impairments would cause him to be absent from work

more than three times a month, AR at 793, 798, 1040, if accorded more weight,

would change the disability determination in light of the VE's testimony that

Roman would be unable to keep a job if he were absent more than eight hours per

month, including tardiness.  *Id.* at 152–53.  Thus, the question of whether the ALJ

properly weighed the opinions of Roman's treating psychiatrists is material to the

disability determination, as the limitations are potentially dispositive to whether

any sedentary jobs exist based on Roman's impairments.  *See, e.g., Greek v. Colvin,*

802 F.3d 370, 376 (2d Cir. 2015) ("ALJ's failure to provide adequate reasons for rejecting [treating physician's] opinion was not harmless" because "vocational expert . . . testified that [plaintiff] could perform no jobs available in large numbers in the national economy if he had to miss four or more days of work per month"); *Pines*, 2015 WL 872105, at *9–10 (case remanded to elicit further information regarding "narrow, yet potentially dispositive issue").

### 3.  Roman's Credibility Should Be Revisited on Remand

Because the Court concludes that the ALJ did not follow the treating physician rule and remands on that basis, the Court need not decide the issue as to whether the ALJ erred in assessing Roman's credibility.  Nevertheless, the Court will briefly address it as a revised application of the treating physician rule will have consequences for the ALJ's credibility determination.  *See, e.g., Mortise v. Astrue*, 713 F. Supp. 2d 111, 124–25 (N.D.N.Y. May 13, 2010) ("The ALJ's proper evaluation of [the threating physician]'s opinions will necessarily impact the ALJ's credibility analysis.  Thus, the credibility evaluation is necessarily flawed").

Here, the ALJ correctly addressed the applicable factors in making her credibility determination.  For example, she considered Roman's daily activities, including his ability to prepare meals, perform household chores, shop, manage his finances, travel on public transportation, and tend to self-care tasks, AR at 22; the treatment that Roman received to improve his physical and mental symptoms, including two epidural injections, *id.* at 23, and his psychotropic medication

regimen, *id.* at 25; and the fact that Roman occasionally used a cane to ambulate, *id.* at 27.

The ALJ also appropriately considered the details of Roman's medication regimen, including Roman's testimony about the side effects of his medication, *see id.* at 22 ("[Roman] also noted that he experiences side effects from his various medications, and he testified that he becomes incoherent after taking them") (citing *id.* at 136, 144), but found that Roman's testimony was inconsistent with his previous statements concerning the side effects of his medication, *see id.* at 25 ("[Roman] continued to report that he was doing well with his medication and that he was coping well with his problems of daily living, with no medication side effects"; "[Roman] was stable on his current psychotropic medication regimen and [] reported feeling better, when we was consistent with his medication"). *See Colbert v. Comm'r of Soc. Sec.*, 313 F. Supp. 3d 562 580 (S.D.N.Y. 2018) (while the ALJ's credibility determination "did not explicitly address the side effects of [the claimant's] medications, there is ample evidence in the opinion and the record to 'glean the rationale of the ALJ's decision'") (quoting *Mongeur*, 722 F.2d at 1040).

Roman contends, however, that the ALJ erred in her credibility determination by failing to credit his testimony "that he woke frequently at night and had to nap during the day" as it was consistent with other evidence in the record. Pl. Mem. at 22 (referring to AR at 140). Contrary to Roman's argument, the ALJ properly relied on evidence that Roman rarely reported fatigue and, at times, denied fatigue. AR at 24 (citing *id.* at 824, 863, 892, 1099). Moreover, in addressing

Roman's obstructive sleep apnea, the ALJ relied on medical evidence demonstrating that his sleep apnea was effectively treated with nightly use of a CPAP machine, *id.* at 24 (referring to AR at 1031).  Notably, Roman acknowledged that he was using a CPAP machine at the time of his hearing.  *Id.* at 39.

In sum, the evidence in the record tends to support the ALJ's credibility determination.  However, because the ALJ failed to correctly apply the treating physician rule, the Court is unable to conclude that the ALJ properly evaluated Roman's credibility.  Accordingly, on remand, the ALJ should revisit her credibility determination and reconfirm or revise it as appropriate.

### 4.  The ALJ Did Not Err in Evaluating Roman's Obesity

Finally, Roman contends that the ALJ erred by providing a "boilerplate evaluation" of Roman's obesity and by failing to consider explicitly Roman's obesity in step four and five of the five-step sequential analysis.  Pl. Mem. at 23.  This argument is unpersuasive.  Social Security guidelines articulate that "an ALJ should consider whether obesity, in combination with other impairments, prevents a claimant from working." *Guadalupe v. Barnhart*, 04-CV-7644 (HB), 2005 WL 2033380, at *6 (S.D.N.Y. Aug. 24, 2005) (citing *Titles II and XVI: Evaluation of Obesity*, SSR 02-1p, 2000 WL 33952015 (S.S. A 2000); 20 C.F.R. 404, Subpt. P, App. 1, Part A § 1.00B(2)(d).  To satisfy these guidelines, however, an ALJ may implicitly factor plaintiff's obesity into her RFC determination by "relying on medical reports that repeatedly note[] [plaintiff's] obesity and provide[] an overall assessment of [his] work-related limitations." *Drake v. Astrue*, 443 F. App'x 653,

657 (2d Cir. 2011); *see, e.g., Guadalupe*, 2005 WL 2033380, at *6 ("When an ALJ's

decision adopts the physical limitations suggested by reviewing doctors after

examining the Plaintiff, the claimant's obesity is understood to have been factored

into their decisions . . . The ALJ's decision sufficiently, if somewhat indirectly,

accounted for Plaintiff's obesity and determined that it did not impose a functional

limitation on light work.").

Here, the ALJ properly considered Roman's obesity.  She explicitly discussed

Roman's obesity in her summary of the record at step two, finding that Roman's

"obesity does not combine with his other impairments to meet or equal any medical

listing." AR at 19.  Moreover, the ALJ properly evaluated Roman's obesity in

determining his RFC determination by explicitly addressing Roman's BMI at step

four, *id.* at 24 (referring to *id.* at 819, 951, 992, 1015, 1048), and by relying on

medical reports that address Roman's obesity and assess his limitations, *see, e.g., id.*

at 22–23 (relying on Dr. Archbald's opinion which reports Roman's weight and

assesses physical limitations); *id.* at 26 (relying on Dr. Han's opinion which noted

Roman's morbid obesity and opined on workplace limitations).   The ALJ, in relying

on these medical records, implicitly factored obesity into her final determination as

to Roman's disability.  *See Paulino v. Astrue*, 08-CV-02813 (CM) (AJP), 2010 WL

3001752, at *18 (S.D.N.Y. July 30, 2010) ("An ALJ's final determination can

constitute an appropriate consideration of the effects of obesity if it properly weighs

evaluations by doctors that have accounted for the claimant's obesity."), *adopted by*

Order dated Aug. 20, 2010 (Dkt. No. 24).  Accordingly, the ALJ did not err in her

evaluation of Roman's obesity.  However, on remand, the ALJ should reconsider Roman's obesity after properly applying the treating physician rule, as a revised assessment of the treating physicians' opinions may affect these findings.

## III.   CONCLUSION

For the foregoing reasons, Roman's motion for judgment on the pleadings is granted, the Commissioner's cross-motion is denied, and the case is remanded to the ALJ pursuant to sentence four of 42 U.S.C. § 405(g).  Specifically, on remand, and consistent with this Opinion, the ALJ should:

(1) Provide a comprehensive analysis, including the application of the *Burgess* factors, for the weight assigned to the opinions of treating physicians Drs. Themistocle, Nunes, and Smith, if deemed less-than-controlling;

(2) Reevaluate Roman's credibility based on further development of the record; and

(3) Reconsider Roman's obesity after properly applying the treating physician rule.

The Clerk of Court is directed to close the motions at docket numbers 10 and 12, marking number 10 as granted and number 12 as denied.

**SO ORDERED.**

Dated: August 21, 2020
         New York, New York

_____
JAMES L. COTT
United States Magistrate Judge